## G. A. ELZIG v. J. H. BALES, Appellant.

**Highways:** OBSTRUCTION: LIABILITY FOR INJURY. One who has caused an excavation to be made in a highway for the purpose of drainage, in such manner as to amount to an obstruction prohibited by law, cannot relieve himself from liability for injury caused thereby by saying that he had arranged with another person to remove the same and that such person had failed to do so.

**Personal injury:** BEST EVIDENCE. It is not permissible for a physician, in a personal injury action, to describe the condition of an injury as ascertained from an examination of a photograph of the same; since it is not the best evidence.

**Damages:** PREJUDICIAL EVIDENCE. It is improper to permit a witness to describe the process of amputating a limb, in a personal injury action, where there is no evidence of reasonable certainty that amputation will be necessary; as the same would tend to arouse the sympathy of the jury.

**Damages.** It is not enough that future suffering is possible, it must be reasonably certain, to be taken into consideration in determining the compensation for an injury.

**Same.** In a personal injury action a recovery should not be allowed for medicines not shown to have been prescribed, or necessary, or that the price paid therefor was its reasonable value.

*Appeal from Hardin District Court.*— HON. J. R. WHITAKER, Judge.

WEDNESDAY, JULY 3, 1907.

ACTIONS for damages resulted in a verdict for plaintiff. The defendant appeals.— *Reversed.*

*Albrook & Lundy,* for appellant.

*W. L. Weaver* and *M. J. Wade,* for appellee.

LADD, J.— As plaintiff was driving along the highway, his team shied from a paper in the way, and one of them went into a ditch about six feet from the traveled road and

1. HIGHWAYS: obstruction: liability for injury.

some eighteen feet from the fence. The horses floundered, and in some manner plaintiff caught his foot in the wheel, and his leg and back were strained. This ditch had been excavated for tiling about two or three feet deep at that place, with dirt on both sides, though most of it had been thrown toward the fence. The defendant insists that the negligence in leaving the ditch unfilled was that of an independent contractor, and for this reason he is not liable. It is not material whether the engineer, who prepared the profile and data for the system of drainage, and the contractor, who excavated the ditches, laid the tile, and barely covered it, were independent contractors. The accident was not due to any negligence on their part. The ditch was left open precisely as it was to be left by these parties, and as defendant knew it would be; but the tenant in possession of the land to be drained, in consideration of the benefits anticipated from the improvement, had promised to haul the tiling, which he had done, and fill the ditch. He failed to comply with the latter part of the agreement. This, however, did not relieve the defendant from the duty of seeing to it that this was done. It is entirely immaterial whether the tenant was an independent contractor or not. The defendant had caused the excavation to be made in the highway, amounting to an obstruction prohibited by law, and he cannot relieve himself from liability for injuries occasioned thereby, by saying that he had employed some one to fill it, regardless of the nature of such employment, when this not only had not been done, but was never undertaken, save by the public authorities. The statute denounces a penalty against " any person who shall willfully obstruct or injure any public road or

VOL. 135 IA.—14

highway," and an excavation may prove quite as effective an impediment to the use of part of the road as some other obstacle to free passage. Independent of statute, having made the excavation, it was the duty of defendant to restore the road to a safe condition. *Lewiston v. Booth,* 3 Idaho (Hasb.) 692 (34 Pac. 809); *Canoe Creek v. McEniry,* 23 Ill. App. 227; *Temperance Hall Ass'n v. Giles,* 33 N. J. Law, 260; *Runyon v. Bordine,* 14 N. J. Law, 472.

Of course, this does not preclude such obstructions as are essential to the improvement of abutting property, but these must be reasonably necessary for that purpose, and cannot be continued an unreasonable length of time. See *Overhouser v. American Cereal Co.,* 118 Iowa, 417; *Perry v. Castner,* 124 Iowa, 386. Even if defendant had the right to cause the excavation, the jury might well have found that he was negligent in allowing it to continue open longer than was reasonably necessary. As he did not notify the road supervisors, sections 1964, 1965, and 1966 of the Code are not applicable.

II. Dr. Pagelson assisted in an operation on the defendant's leg at the hospital, and testified that the position of the bones of the kneejoint was normal, and was then

2. PERSONAL INJURY: best evidence.

asked: " Q. I will ask you to tell the jury what that skiagraph showed." This was objected to, as not the best evidence, and the court ruled that it made no difference from what source the information came whether from an X—ray photograph, or otherwise, the doctor might testify without telling " the jury what he found on this photograph or on this negative." " Q. In what condition did you find the tissues surrounding the kneejoint? Just describe the muscles and everything. A. Do you mean from the skiagraph? Q. Well any information · you may have." Substantially the same objection was overruled, and the doctor proceeded to answer, with the understanding that he might state what appeared in the skiagraph. How much of his

testimony was based on his own examination of the patient does not appear, nor have we any means of knowing the portions which are merely descriptive of what the picture disclosed. The latter were not admissible, because not the best evidence attainable. Photographs are received as either secondary or demonstrative evidence, according to their use. *Stewart v. Railway,* 78 Minn. 110 (80 N. W. 855); *Cunningham v. Railway,* 72 Conn. 244 (43 Atl. 1047); *Baustian v. Young,* 152 Mo. 317 (53 S. W. 921, 75 Am. St. Rep. 462); *Goldsboro v. Railway,* 60 N. J. Law, 49 (37 Atl. 433). As secondary evidence, the photograph represents the original, whether it be a writing, signature, or human face. As demonstrative evidence, they serve to explain or illustrate, and apply the testimony, and are aids to the jury in comprehending the questions in dispute. No argument is required to show that when taken for either purpose they are the best evidence of what appears on them. If the rule adopted by the trial court were to prevail, a physician might testify to the internal conditions of the human body without other information than that afforded by an unauthenticated skiagraph. That X-ray photographs, when properly verified, are admissible in evidence, is fully settled by the authorities. *Mauch v. Hartford,* 112 Wis. 40 (87 N. W. 816); *Jameson v. Weld,* 93 Me. 345 (45 Atl. 299); *Bruce v. Beall,* 99 Tenn. 303 (41 S. W. 445); *Miller v. Dumon,* 24 Wash. 648 (64 Pac. 804); *De Forge v. Railway,* 178 Mass. 59 (59 N. E. 669; 86 Am. St. Rep. 464); *Geneva v. Burnett,* 65 Neb. 464 (91 N. W. 275, 58 L. R. A. 287, 101 Am. St. Rep. 628); 17 Cyc. 420. The rule exacting the best evidence applies to the testimony of experts, as well as to that of other witnesses, and we are of the opinion that the court erred in permitting the doctor to testify to what appeared in the skiagraph.

III. The evidence left no doubt but that plaintiff suffered a serious injury. The knee and leg below were enlarged. The tissues above the knee had become soggy, so

that upon being pressed with the finger a dent in the flesh re-
mained for a time.   The entire leg was darker

3. DAMAGES:
    prejudicial          than normal.   The physicians testified that
    evidence.            the swelling was caused by an obstruction of
the venous circulation, probably located a little above the
kneejoint.   Two operations had been performed; the first
proving merely exploratory, nothing abnormal being found
in the tissues or bones.   At the second operation, the semi-
lunar cartilage, which acts as a cushion for the knee-
joint, had become loose, and was removed.   Dr. Pagelson
testified that: " The continuance of this condition will de-
pend somewhat upon what causes this obstruction.   If it is
due to venous obstruction, the restoration is sometimes com-
plete.   It might possibly be due to the scar formation from
the edema, and, if the obstruction is due to that, the chances
are it would get a little worse, and that might result in gan-
grene.   Q. In your professional opinion, now, what is the
best treatment and the best thing that can be done for this
limb, considering, his general health and his life ?   (Ob-
jected to as incompetent, irrelevant, and immaterial.   Over-
ruled.)   A. The best thing to do with him would be to put
him to bed and keep him there for three or four months with
this limb elevated and see if the swelling won't go down,
and probably have an elastic bandage applied from the knee
down.   Q. I will ask you to state what would be the prob-
able effect upon the system, general system, of the plaintiff
in reference to the shock of an operation or amputation of
his leg ?   (Objected to as irrelevant, immaterial, and no
proper foundation having been laid for the interrogatory,
and because there is no testimony in the record tending to
show that an amputation will be necessary or probably be
necessary, and there is no showing that this will be proper
treatment.   Overruled.)   A. I think he will stand the op-
eration all right.   Q. Yes, but what I mean now is that I
want you to describe this operation, so that the jury will see
the effect of the shock on his system."   The same objection

was overruled, and the witness proceeded to describe the operation graphically, and in answer to other questions stated what the hospital and surgeon charges would be.

The description of the operation was well calculated to arouse the sympathies of the jury, and evidently elicited for that purpose. No evidence had been introduced tending to show that an amputation might become necessary. Indeed, not only the testimony of this witness, but also that of Drs. Morton and Morse, all the physicians, was to the effect that the edematous condition would be likely to yield to the treatment described, and it was recommended, together with massage, by all of them. Subsequently, Dr. Morton indicated the exact trouble could not be positively ascertained, save that the circulation was impeded, and he was asked, if the treatment recommended failed, what he would do next, and said he did not know what would be best. " Q. What I am trying to get at, can there any good be done if that did not result well? Give the different things that could be done, so the jury can find out the chances of this man. (Objected to as immaterial, speculative, irrelevant, and incompetent. Overruled.) A. Well there is two things that might be done: Make an incision in the cynovial space, and determine whether or not there is any pressure or anything that causes pressure upon the blood vessels that might be removed or amputate the leg." But he was of the opinion that " there is a reasonable prospect of benefit from caring for the leg in the way recommended." Dr. Morse testified that, if present conditions continued without improvement, plaintiff would ultimately lose his leg, and, with respect to the treatment described, that: " You cannot always tell, of course, what would be the result, but it is ordinarily quite successful. It is not essential to elevate the limb to such a degree as to make it a matter of great discomfiture, but say an elevation of 45 degrees is sufficient." He was of the opinion that: " If the treatment that I have recommended was filled, the prospects are that he would have

a good leg; and, if the treatment had been given at an earlier stage of this condition, the result would have been probably more beneficial and speedy, and the longer the leg is allowed to run in the condition it has been in the more difficult it will be to re-establish the circulation."

No witness testified that amputation would be necessary. All expressed the opinion that great benefit, if not an entire cure, save that the kneejoint would continue stiff, would result from treating the leg as recommended. It could not have been said, in the light of this expert evidence, to be reasonably certain that amputation would be necessary. Plaintiff testified that his leg was elevated on pillows for three weeks at the hospital, when his physicians advised him to take it down because of pain, and that he had tried it a couple of times since, one for two days, and found that he could not endure the treatment. Before the wound had healed, it might have been painful to keep the leg elevated, and plaintiff's experiments might have been under improper conditions. These physicians did not think the treatment impractical. At any rate, no test was made of the other treatment recommended by these physicians, either in connection with keeping his leg elevated, or separately, such as massage and the use of an elastic bandage. Possibly an amputation will be necessary; but we think the evidence left it largely a matter of conjecture, and that a finding therefrom that this would be reasonably certain would not have been sustained by the evidence. For this reason the harrowing description of amputating a leg was inadmissible.

It is not enough that the future suffering or expenses may be possible or barely probable. They must be shown to be reasonably certain in the future, in order to be taken into consideration in fixing the compensation to be allowed. *Saunders v. O'Callaghan,* 111 Iowa, 576.

4. Damages.

IV. One of the physicians was asked whether there was any probability of absorption " in a case of scar tissue

that has been there for more than a year." Objection to this inquiry should have been sustained, on the ground that there was no showing that such tissue had existed for the time mentioned.

V. Recovery for part of the amount paid out for medicines, without any showing that these were prescribed by physicians, or necessary, or that the amount paid was the reasonable value thereof was allowed. This was error.

5. SAME.

Some other rulings are complained of, but do not require discussion.

Because of the errors pointed out, the judgment is *reversed*.

WEAVER, J., took no part.